IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32961-5-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 34159-3-III) |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL MATTHEW GROVES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| | ) | |
| JOEL M. GROVES. | ) | |

LAWRENCE-BERREY, A.C.J. — Joel Groves appeals his convictions for first degree assault, drive-by shooting, felony harassment, and first degree unlawful possession of a firearm. He argues the State failed to present sufficient evidence to sustain any of his convictions. He also argues that the trial court improperly added a firearm enhancement to his drive-by shooting sentence and that his sentence for harassment exceeded the statutory maximum. Mr. Groves raises numerous other arguments in his statement of additional grounds for review (SAG), a supplemental SAG, and a consolidated personal restraint petition (PRP).

We conclude the State failed to present sufficient evidence to sustain Mr. Groves's

harassment conviction and accept the State's concession that the trial court erred when it

imposed the firearm enhancement to Mr. Groves's drive-by shooting conviction, but

otherwise affirm his other convictions and reject his SAG and PRP arguments.

## FACTS

In the summer of 2014, Ryan Smith and Zach Koback began arguing with one

another over Facebook. Mr. Smith insulted Mr. Koback's mother, Cathy Sampson. At

some point Mr. Smith's friend, DaQwon "Dizzy" Kessay, became involved in the dispute

as well.

On July 8, 2014, Mr. Koback was at the lake with his friend Jordan Hanson, his

mother, and his mother's boyfriend, Mr. Groves. Mr. Koback told Mr. Groves about how

Mr. Smith had insulted his mother. Both Mr. Koback and Mr. Groves were very upset.

Mr. Groves told Mr. Koback that he needed to "defend [his] mom's honor" and stand up

for her. Report of Proceedings (RP) at 682. Mr. Koback decided he needed to fight Mr.

Kessay.

Mr. Groves drove Mr. Koback and Mr. Hanson to Mr. Kessay's apartment so Mr.

Koback could fight Mr. Kessay. Only these three were in the car. Mr. Groves drove his

gray Mitsubishi while Mr. Koback gave him directions. Mr. Groves told Mr. Koback to

2

"try [his] hardest and to just—do what [he could] to defend [his] mom's honor." RP at 685.

At this time, Mr. Smith, Devon Lowe, Blake Campbell, and Scott Adams were at Mr. Kessay's apartment relaxing and playing video games. Mr. Kessay had just arrived home from work and was in the shower. Mr. Adams heard a car pull up outside, and he looked out the window and saw the Mitsubishi. He saw Mr. Koback get out of the passenger side door. Mr. Adams saw the driver was a bald white man in his mid-to-late 40s with stubby facial hair, but Mr. Adams did not recognize him. The man was fidgeting with something in his lap.

Mr. Koback, with Mr. Hanson following, walked up to Mr. Kessay's apartment. Mr. Koback pounded on the door. He told the people inside the apartment to come outside. Mr. Lowe went and opened the door. He saw Mr. Koback, closed the door, and went and got Mr. Kessay.

Mr. Kessay retrieved a loaded handgun from a drawer. Mr. Kessay cracked the door open and began arguing with Mr. Koback through the crack in the door. Mr. Hanson stood silently behind Mr. Koback. Mr. Kessay did not see anything in either Mr. Koback's or Mr. Hanson's hands. Off to the side of the apartment building, Mr. Kessay noticed a man inside a car who looked busy.

3

Mr. Koback noticed Mr. Kessay's handgun and then said, "'Dizzy's got a gun.'" RP at 378. Mr. Kessay opened the door wider and saw a portion of the older man, who by then was standing near the car passenger door. Mr. Kessay noticed the man was holding a large black revolver.

At this point, Mr. Lowe heard an older man's voice that he did not recognize say, "'Dizzy, I got something for you.'" RP at 469. Mr. Adams heard an older voice that he did not recognize say, "'Come outside so I can beat your ass.'" RP at 558.

Mr. Kessay slammed the apartment door right as the man holding the gun fired. Mr. Koback heard the gunshot go off behind him. He did not think the shot came from Mr. Hanson's direction. Mr. Hanson grabbed Mr. Koback's sleeve and told Mr. Koback to get to cover. The bullet went through the door and struck the oven inside the apartment. Mr. Smith, Mr. Lowe, Mr. Campbell, and Mr. Adams all ran into the back bedroom or the bathroom.

After the first shot rang out, Mr. Kessay opened the door slightly and, without looking outside, fired his handgun at the car. Mr. Koback dove into the back of the car, followed by Mr. Hanson. Once inside the car, Mr. Koback saw Mr. Groves had a revolver. Mr. Groves handed Mr. Koback the revolver and told him to put it inside the speaker in the back seat. Mr. Koback did.

4

Mr. Groves, Mr. Koback, and Mr. Hanson drove back to Ms. Sampson's house on Highway 97. When they arrived, Mr. Groves told Mr. Koback to hand him the revolver. Mr. Koback did. Ms. Sampson then arrived at the house from the lake and asked what happened. Mr. Groves and Mr. Koback both told her nothing happened. Mr. Groves spent the night at the house.

The police arrived at Mr. Kessay's apartment not long after the shooting. They noticed large dents and a bullet hole in the door, as well as used shell casings on the ground. They also found a bullet fragment underneath the oven.

The police identified Mr. Groves as a possible suspect and issued a press release to the community the next day. Mr. Adams saw the pictures of Mr. Groves in the press release and was 90 to 95 percent sure it was the same person he saw driving the Mitsubishi. The police arrested Mr. Groves. When they arrested him, Mr. Groves had a goatee, a very short buzz cut, sleeve tattoos, and a muscular build.

On July 9, Detective Tim Weed sought a telephone search warrant to search a house located at 2407 N. Ellington Street, where he believed Mr. Groves occasionally stayed. Detective Weed believed a handgun and ammunition might be there. In his affidavit to the court, Detective Weed stated that an eyewitness, Patrick Kennedy, saw Mr. Groves shoot at Mr. Kessay's door. Detective Weed also stated that another officer

5

had attempted to contact Mr. Groves at this address one month before. Detective Weed

declared that this other officer "knocked on the door and Groves answered the door."

PRP Response, Ex. C, at 4. The court authorized the police to search the 2407 N.

Ellington address for "all handguns, all ammunition, all cellular phones and documents

showing dominion and control over the residence." PRP Response, Ex. C, at 6.

The police executed the search warrant on the 2407 N. Ellington house that day.

Inside a room, the police found prescription bottles and mail with Mr. Groves's name on

them. The police also found a black bag, which contained spent bullet casings as well as

mail addressed to Mr. Groves. The police also found a locked safe underneath a desk.

One of the officers popped the lock, and inside the safe were two bullet holsters

containing live ammunition. The police collected the spent casings from the black bag

and sent them to the Washington State Patrol Crime Laboratory for testing. Mr. Groves

never challenged the probable cause for the issuance of the search warrant.

The State charged Mr. Groves with first degree assault, drive-by shooting, felony

harassment, and first degree unlawful possession of a firearm.

On August 11, Ms. Sampson asked an acquaintance, Brian Anderson, to haul her

trailer full of garbage to the dump. Mr. Anderson went to her house, hooked up the

trailer, and was pulling out of the driveway when he noticed the trash on the trailer was

6

not balanced. He began to move the bags of trash around and found a gun among the bags. He called the police.

Detective Weed drove to Ms. Sampson's house and met with Mr. Anderson. Detective Weed recovered the gun from the trash and identified it as a Ruger revolver with a single action, which meant the user needed to cock the hammer before each shot. The revolver contained five live rounds and one spent cartridge. Detective Weed took the revolver back to the station and it was immediately sent to the Washington State Patrol Crime Laboratory for testing.

Around mid-September, Mr. Groves requested an interview with a detective. Detective Cameron Clasen arranged to meet at the jail with Mr. Groves and Mr. Groves's attorney. At the beginning of the interview, Detective Clasen obtained permission from Mr. Groves and his attorney to record the conversation. Detective Clasen then advised Mr. Groves of his *Miranda*[1] rights, which included the phrase, "Anything you say can be used against you in a court of law." RP at 86. Mr. Groves indicated he understood his rights and agreed to speak to Detective Clasen.

Mr. Groves gave Detective Clasen his version of the incident. He told Detective Clasen that he drove Mr. Koback and Mr. Hanson over to Mr. Kessay's apartment in the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

7

Mitsubishi Eclipse. He stated that Mr. Koback and Mr. Hanson went to the apartment's door while he remained near the driver's side of the Eclipse. He said a shot was fired and Mr. Koback got back into the Eclipse holding a black revolver. He stated he then drove back to Ms. Sampson's house with Mr. Koback.

During the interview, Mr. Groves concluded that Detective Clasen was not interested in solving the crime, but was only interviewing Mr. Groves so he could "use it against [Mr. Groves] in some fashion." RP at 97. Mr. Groves became upset and agitated. At the end of the interview, Detective Clasen asked Mr. Groves if he had given his statement freely, voluntarily, and without any promises. Mr. Groves responded, "'I don't want to say anything else. I'm talking to a man who thinks I'm guilty. I don't want to say anything more to you.'" RP at 89.

Mr. Groves moved to suppress his interview with Detective Clasen. The trial court found that Mr. Groves made the statements knowingly, voluntarily, and intelligently, and ruled they would be admissible at trial.

In late September, the prosecutor called the crime laboratory and informed them the deoxyribonucleic acid (DNA) analysis on the revolver needed to be done as quickly as possible. The prosecutor called the crime laboratory on a weekly basis to check its progress. An employee at the laboratory eventually told the prosecutor that she could

8

expedite the analysis if she had a reference sample of Mr. Groves's DNA. The prosecutor stated she would attempt to get one.

Mr. Groves's trial was set to begin November 4. The last day of Mr. Groves's speedy trial period was November 10. On October 31, the State moved for an order allowing it to take a sample of Mr. Groves's DNA. At the hearing, the prosecutor informed the court that the laboratory had not yet finished analyzing the DNA on the revolver. The prosecutor stated the analysis would be faster if the crime laboratory had a sample of Mr. Groves's DNA, as opposed to running the DNA from the revolver through the Combined DNA Index System (CODIS) database. The court ordered Mr. Groves to provide a DNA sample.

On November 3, Mr. Groves moved in limine to exclude any potential DNA evidence from the revolver. He argued that he wished to seek a second opinion on any DNA evidence that might be on the revolver, and that allowing the State to introduce this late-produced evidence would force him to choose between a speedy trial and effective assistance of counsel. The trial court held a hearing on Mr. Groves's motion. The State indicated the DNA analysis would be done either that day or the next day, but the crime laboratory had not started ballistics testing yet. The State asked the court to extend Mr. Groves's speedy trial expiration date in order to allow the crime laboratory to finish

9

analyzing the revolver. Mr. Groves objected. The trial court found that adequate grounds supported the State's motion for a continuance within the cure period and continued the trial to November 12 per CrR 3.3(g).

On November 5, the crime laboratory completed its DNA analysis. Amy Jagmin, the DNA scientist, found a DNA profile on the hammer of the revolver that originated from at least two people. She compared the major profile to the sample from Mr. Groves's buccal swab and concluded they matched. Ms. Jagmin's report also stated:

> The major profile from the hammer of the revolver (QC) was uploaded to and searched against the state level of the Combined DNA Index System (CODIS) database, and no probative matches resulted. The profile will be searched against the national level of the CODIS database at a future date. If any probative matches occur, an additional report will be provided.

SAG Attach. B at 2.

The revolver was then immediately sent to a ballistics analyst, who completed ballistics testing on November 7. The ballistics analyst concluded the bullet that was underneath Mr. Kessay's oven in the apartment came from the same revolver.

On November 7, the State provided the DNA and ballistics analyses to Mr. Groves. Mr. Groves again moved to suppress the DNA evidence on the basis that he needed time to have the DNA on the revolver retested. The trial court denied Mr. Groves's motion, but ordered the State to give Mr. Groves "complete access" to the DNA

10

and ballistics analysts up until the day the analysts would testify at trial. RP at 171. The trial court also found that the State had made diligent efforts to obtain the evidence.

While awaiting trial, Mr. Groves made three telephone calls from jail to his new girlfriend. During the first call, he told her that, "'Even if I had a gun nobody got hurt.'" RP at 1160. During the second call, he said, "'This all happened so goddam [sic] fast, you know what I mean, it just happened fast. I'm thinking that I'm going (inaudible) handle a fistfight or something, you know?'" RP at 1161. During the last call, he said, "'I could have just went ahead and let (inaudible) shoot Zack. . . . That's what's I should have done. I should have just left the kid (inaudible) on his goddam [sic] own—let this happen.'" RP at 1161-62.

At trial, in addition to calling Mr. Koback, Mr. Hanson, and everyone who was inside the apartment, the State produced another witness: Patrick Kennedy, who was friends with Mr. Koback and Mr. Hanson. Mr. Kennedy was riding his bike to Mr. Kessay's apartment on the night of the shooting. When he arrived at the apartment building, he saw Mr. Koback banging on Mr. Kessay's door and yelling. He saw Mr. Hanson standing just off Mr. Koback, to the side of the door.

Mr. Kennedy testified he also saw an older bald man with sleeve tattoos who he did not recognize. This man had a revolver. Mr. Kennedy heard the man say, "'Oh, I got

11

something for you.'" RP at 591. After the older man said this, Mr. Kennedy ran away.

He then heard a gunshot. Mr. Kennedy testified the older man got into the driver's side

of the car, and Mr. Koback and Mr. Hanson got in on the passenger's side. They then

left. Finally, Mr. Kennedy testified that the police later showed him a photo lineup and he

was 90 percent sure Mr. Groves was the shooter.

The State also called Detective Clasen. Detective Clasen testified about his

interview with Mr. Groves in the jail.

The State also called Kathy Geil, the firearm and toolmark examiner at the

Washington State Patrol Crime Laboratory. Ms. Geil testified she received the Ruger

revolver, the spent casings, and the bullet fragment. She fired test shots from the revolver

and compared those test shots to the spent casings and the bullet fragments she had

received. She determined the bullet fragment that was under Mr. Kessay's oven came

from the Ruger revolver. She also determined the spent casings from the black bag in Mr.

Groves's bedroom also came from the revolver.

The State also called Ms. Jagmin, the DNA scientist at the Washington State Patrol

Crime Laboratory who tested the Ruger revolver. Ms. Jagmin testified that she tested the

revolver's grip, cylinder, and trigger, and found at least three people's DNA on them, but

because it was a low level and it was a complex mixture, she could not do any further analysis or comparisons.

However, Ms. Jagmin testified she was able to obtain a robust profile on the revolver's hammer, which the user needed to pull back to cock the gun. She determined there was a mixture of two people's DNA on the hammer. Of these two people, there was "one main person and then a trace of somebody else." RP at 1006. She was able to compare the major profile to Mr. Groves's reference sample and concluded they matched. She was not given anyone else's DNA to compare.

The jury found Mr. Groves guilty on all four counts. It also returned special verdicts finding Mr. Groves was armed with a firearm at the time he committed the first degree assault, drive-by shooting, and harassment.

On the first degree assault count, the trial court sentenced Mr. Groves to 279 months' confinement plus a 60-month firearm enhancement. On the drive-by shooting count, the court sentenced Mr. Groves to 101 months' confinement plus a 36-month firearm enhancement. On the harassment count, the court sentenced Mr. Groves to 55 months' confinement plus an 18-month firearm enhancement. On the unlawful possession count, the trial court sentenced Mr. Groves to 101 months. The court ran all

13

the sentences concurrently except for the corresponding firearm enhancements, which it ran consecutively to the rest of the sentence.

Mr. Groves appealed. Mr. Groves later filed a CrR 7.8 motion to dismiss the case, arguing the search and arrest warrants were defective and he received ineffective assistance of counsel. The trial court transferred Mr. Groves's motion to this court for consideration as a PRP pursuant to CrR 7.8(c)(2). This court consolidated Mr. Groves's PRP with his direct appeal.

## ANALYSIS

A.  SUFFICIENCY OF THE EVIDENCE

Mr. Groves argues the State presented insufficient evidence to sustain all four of his convictions.

In a criminal case, evidence is sufficient to convict if it permits a rational trier of fact to find the essential elements of the crime proved beyond a reasonable doubt. *State v. Munoz-Rivera*, 190 Wn. App. 870, 882, 361 P.3d 182 (2015). When a defendant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of

14

the State and interpreted most strongly against the defendant." *Id.* Furthermore, "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

In a challenge to the sufficiency of the evidence, circumstantial evidence and direct evidence carry equal weight. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Instead, because the jurors observed the witnesses testify firsthand, this court defers to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

1.    *First degree assault*

Mr. Groves contends insufficient evidence supports his conviction for first degree assault because no one saw him fire a gun at Mr. Kessay.

"A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). Mr. Groves does not argue the State's evidence was insufficient to prove a specific element of

15

first degree assault. Rather, his sufficiency claim is more general—he argues the State's

evidence was insufficient to prove he was the shooter.

Mr. Groves is correct that none of the State's witnesses conclusively identified him

as the shooter. However, this court gives equal weight to circumstantial evidence.

*Goodman*, 150 Wn.2d at 781. Ample circumstantial evidence supports the jury's finding

that Mr. Groves was the shooter.

First, multiple witnesses testified that Mr. Groves had a revolver immediately

before and after the shooting. Mr. Adams saw Mr. Groves "fidgeting" with something in

his lap before he got out of the car. RP at 554. Mr. Kennedy saw Mr. Groves holding the

revolver moments before the shot was fired. Mr. Kessay saw the shooter's arm holding a

large black revolver. Immediately after the shooting, Mr. Groves gave Mr. Koback a

revolver and told him to hide it in the car speaker.

Moreover, the State's scientific evidence established two facts: (1) Mr. Groves had

handled the revolver that was in Ms. Sampson's trash, and (2) that same revolver was

used in the shooting. Ms. Jagmin testified Mr. Groves's DNA was on the hammer, which

was used to cock the gun. Ms. Geil testified the bullet fragment under Mr. Kessay's oven

came from that same revolver. She also testified the spent casings the police found in Mr.

Groves's black bag were fired from that revolver. Based on these facts, a reasonable jury

16

could have deduced that Mr. Groves was the shooter.

Additionally, a reasonable jury could have concluded Mr. Groves was the shooter based on the process of elimination. It is undisputed that Mr. Groves, Mr. Hanson, and Mr. Koback were the only ones who went to Mr. Kessay's apartment in the Mitsubishi. Multiple witnesses testified that Mr. Koback stood at the door while Mr. Hanson stood close behind him. Mr. Koback heard the gunshot go off behind him, and it did not come from Mr. Hanson's direction. Multiple witnesses also testified Mr. Koback and Mr. Hanson did not have anything in their hands.

Accordingly, viewed in the light most favorable to the State, and drawing all reasonable inferences in favor of the State, we conclude that the foregoing evidence was sufficient to permit a rational jury to find, beyond a reasonable doubt, that Mr. Groves was the shooter. Sufficient evidence supports his first degree assault conviction.

2.     *Drive-by shooting*

Mr. Groves also argues the State's evidence was insufficient to convict him for drive-by shooting. Mr. Groves does not argue the State's evidence was insufficient to prove any particular element of drive-by shooting as it is defined in RCW 9A.36.045(1). Rather, he relies on his previous argument that the State presented insufficient evidence

to prove he was the shooter. As discussed above, the State presented ample circumstantial evidence he was the shooter. Thus, this claim fails.

3.    *First degree unlawful possession of a firearm*

Mr. Groves argues insufficient evidence supports his conviction for first degree unlawful possession of a firearm. He argues the State failed to prove he constructively possessed the gun.

RCW 9.41.040(1)(a) provides that a person is guilty of first degree unlawful possession of a firearm if he or she has been convicted of a serious offense and "owns, has in his or her possession, or has in his or her control any firearm." "Possession may be actual or constructive." *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012). Actual possession means the defendant had "'personal custody'" or "'actual physical possession.'" *State v. Manion*, 173 Wn. App. 610, 634, 295 P.3d 270 (2013) (quoting *State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994); *State v. Spruell*, 57 Wn. App. 383, 385, 788 P.2d 21 (1990)).

The State may prove actual possession by direct evidence, such as testimony that a witness observed the defendant with the firearm. *See State v. Berrier*, 110 Wn. App. 639, 647, 41 P.3d 1198 (2002). The State may also prove actual possession by circumstantial evidence, such as the defendant's DNA on the firearm. *Manion*, 173 Wn. App. at 634.

18

Here, the State proved actual possession through direct evidence. Mr. Kennedy saw a man with the revolver, and he later identified the man as Mr. Groves. Mr. Koback also saw Mr. Groves possess the revolver in the Mitsubishi immediately after the shooting. The State also proved actual possession through circumstantial evidence—Mr. Groves's DNA was on the hammer of the revolver. Sufficient evidence supports Mr. Groves's conviction for unlawful possession of a firearm.

### 4. *Felony harassment*

Mr. Groves also asserts that insufficient evidence supports his felony harassment conviction. He claims the State presented no evidence that Mr. Kessay reasonably feared Mr. Groves would carry out his threat because Mr. Kessay never actually heard the threats.

To convict a person for felony harassment based on threats to kill, the State has to prove beyond a reasonable doubt that the defendant (1) without lawful authority, (2) knowingly threatened to kill some other person immediately or in the future, and (3) the defendant's words or conduct placed the person threatened in reasonable fear that the threat to kill would be carried out. RCW 9A.46.020(1)(a)(i), (2)(b); *State v. C.G.*, 150 Wn.2d 604, 609-10, 80 P.3d 594 (2003).

19

The person to whom the threat is communicated does not have to be the victim of the threat. *State v. J.M.*, 144 Wn.2d 472, 488, 28 P.3d 720 (2001). For example, a child can still be guilty of harassment if he tells his classmates that he wants to bring a gun to school and shoot his principal. *Id.* The statute also does not require the defendant to know that his or her threat will eventually be communicated to the victim. *Id.* For example, if the child tells his classmates in confidence that he wants to shoot the principal, his classmates tell a counselor, and the counselor tells the principal, the child is still guilty of harassment. *Id.* at 475, 488.

Although the person who hears the threat and the victim of the threat do not have to be the same person, "the harassment statute requires that the person threatened learn of the threat and be placed in reasonable fear that the threat will be carried out." *State v. Kiehl*, 128 Wn. App. 88, 93, 113 P.3d 528 (2005); *see also J.M.*, 144 Wn.2d at 482 (harassment statute requires that "the person threatened must find out about the threat although the perpetrator need not know . . . that the threat will be communicated to the victim").

For example, in *Kiehl*, Gary Kiehl told his mental health counselor that he wanted to kill a local judge. *Kiehl*, 128 Wn. App. at 90. He then acted out in detail how he would kill the judge. *Id.* The State charged Mr. Kiehl with felony harassment based on

20

these statements. *Id.* The judge did not testify at trial. *Id.* at 91. The State presented no evidence that the judge was aware of the threat, or that he reasonably feared Mr. Kiehl would carry out the threat. *Id.*

The *Kiehl* court held the State's evidence was insufficient to support Mr. Kiehl's conviction. *Id.* at 94. The court reasoned that the harassment statute requires the victim to learn of the threat, and therefore the State needed to prove that (1) Mr. Kiehl threatened to kill the judge, (2) the judge learned of the threat Mr. Kiehl communicated to his counselor, and (3) upon learning of this threat, the judge was placed in reasonable fear that the threat would be carried out. *Id.* at 93. Because the State failed to prove the judge—not the counselor—knew about Mr. Kiehl's threat and feared the threat would be carried out, the evidence was insufficient to support Mr. Kiehl's harassment conviction. *Id.* at 94.

Here, the State charged Mr. Groves with harassment based on his threat to kill Mr. Kessay. The State argues the evidence is sufficient to support Mr. Groves's felony harassment conviction based on both a verbal threat as well as a nonverbal threat.

Mr. Groves made several verbal threats before shooting into Mr. Kessay's apartment. However, the harassment statute requires Mr. Kessay to have been in reasonable fear that Mr. Groves would carry out his verbal threats. Like the judge in

21

*Kiehl*, there is no evidence Mr. Kessay ever learned about Mr. Groves's verbal threats. Mr. Lowe heard Mr. Groves say, "'Dizzy, I got something for you.'" RP at 469. Mr. Adams heard Mr. Groves say, "'Come outside so I can beat your ass.'" RP at 558. Mr. Kennedy heard Mr. Groves say, "'Oh, I got something for you.'" RP at 591. But Mr. Kessay never testified he heard any of these statements.

The State appears to also argue that Mr. Groves nonverbally threatened Mr. Kessay by pointing the revolver at him. Thus, the evidence may still be sufficient to uphold Mr. Groves's harassment conviction if the arm pointing the gun was a "threat to kill" for purposes of the harassment statute.

"Threat" means to communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened. RCW 9A.04.110(28)(a). "'Communication' is '[t]he expression or exchange of information by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception.'" *State v. Toscano*, 166 Wn. App. 546, 554, 271 P.3d 912 (2012) (quoting BLACK'S LAW DICTIONARY 296 (8th ed. 2004)).

In *Burke*, the court held that Mr. Burke's "physical behavior" met the statutory definition of "threat" when he took a "fighting stance" like a boxer with raised fists. *State v. Burke*, 132 Wn. App. 415, 421, 132 P.3d 1095 (2006). In contrast, in *Toscano*,

22

the court held that Ms. Toscano's actions did not meet the statutory definition of "threat" when she attempted to run her car into a police vehicle and then stopped her car in the police officer's path. *Toscano*, 166 Wn. App. at 554. The *Toscano* court held that unlike the defendant in *Burke*, Ms. Toscano was not expressing information to or exchanging information with the officer. *Id.* Although her actions suggested she wanted to hurt the officer or interrupt his chase, the *Toscano* court held that wanting a particular result is not communication. *Id.*

Here, Mr. Groves's actions were not clear nonverbal communication. Mr. Kessay could not see Mr. Groves at all. He only got a "quick glimpse" of an arm and a barrel before he slammed the door. RP at 378. Mr. Groves did not express or exchange information with Mr. Kessay or bring an idea to his perception. Because this was not a communication between Mr. Groves and Mr. Kessay, it was not a nonverbal threat and, therefore, it was not felony harassment.

We conclude the evidence is insufficient to support Mr. Groves's harassment conviction. We reverse and remand for judgment of dismissal with prejudice.[2] *See State v. Rodgers*, 146 Wn.2d 55, 60, 43 P.3d 1 (2002); *Kiehl*, 128 Wn. App. at 94.

---

[2] Because we reverse Mr. Groves's harassment conviction, we need not consider

23

## B. FIREARM ENHANCEMENT ON DRIVE-BY SHOOTING CONVICTION

Mr. Groves argues, and the State concedes, that the trial court exceeded its statutory authority when it imposed a firearm enhancement for his drive-by shooting conviction. Although Mr. Groves did not object at the sentencing hearing, defendants may generally challenge sentences that do not comply with sentencing statutes for the first time on appeal. *E.g.*, *State v. Bahl*, 164 Wn.2d 739, 744, 193 P.3d 678 (2008).

A sentencing court adds a firearm enhancement to the standard sentence range for felony crimes if the offender was armed with a firearm and the offender is being sentenced for one of the crimes eligible for firearm enhancements. RCW 9.94A.533(3). RCW 9.94A.533(3)(f) provides:

> The firearm enhancements in this section shall apply to all felony crimes except the following: Possession of a machine gun, possessing a stolen firearm, *drive-by shooting*, theft of a firearm, unlawful possession of a firearm in the first and second degree, and use of a machine gun in a felony.

(Emphasis added.)

Because RCW 9.94A.533(3)(f) prohibits courts from imposing firearm enhancements to drive-by shooting convictions, we remand for the trial court to strike this enhancement.

---

his argument that his sentence for harassment exceeded the statutory maximum.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW
AND PERSONAL RESTRAINT PETITION[3]

A defendant is permitted to file a pro se SAG in a criminal case on direct appeal. RAP 10.10(a). This statement is not required to cite authorities or to the record itself, but must have sufficient specificity to inform the court of the "nature and occurrence" of specified errors. RAP 10.10(c). The SAG must not rely on matters outside the record. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

In order to obtain relief by means of a PRP, a petitioner must demonstrate that he or she is under restraint and that the restraint is unlawful. *In re Pers. Restraint of Wheeler*, 188 Wn. App. 613, 616, 354 P.3d 950 (2015). To show the restraint is unlawful, a petitioner must either show that a constitutional error occurred that resulted in actual and substantial prejudice, or a nonconstitutional error occurred that constituted a fundamental defect and resulted in a complete miscarriage of justice. *Id.* at 617; *In re Pers. Restraint of Gentry*, 170 Wn.2d 711, 714, 245 P.3d 766 (2010).

A.    STATE'S DISCLOSURE OF DNA EVIDENCE

Mr. Groves argues the trial court should have suppressed the DNA evidence from the revolver because of the State's "blatant discovery violation." SAG at 20. He also

---

[3] Mr. Groves's SAGs and PRP consist of 104 pages of briefing, not including exhibits. Because many of the issues overlap, they are consolidated here.

25

argues that the trial court abused its discretion when it continued the trial from November 4 to November 12.

CrR 4.7 lists the prosecuting attorney's responsibilities when engaging in discovery. Generally, the prosecuting attorney must disclose evidence in its possession or control that is material and favorable to the defendant. CrR 4.7(a). Mr. Groves fails to present any evidence that the DNA evidence was within the prosecuting attorney's possession or control. The evidence actually refutes this. The crime laboratory had not finished its DNA and ballistics analyses, and the trial court reasoned there had not been "any kind of dilatory conduct on the part of the prosecution." RP at 145.

The trial court also did not abuse its discretion when it declined to exclude the DNA and ballistics evidence as a sanction. Washington courts have generally limited the extraordinary remedies of exclusion and dismissal to situations where the State did not act with due diligence. *E.g.*, *State v. Cannon*, 130 Wn.2d 313, 328-29, 922 P.2d 1293 (1996). Here, the trial court determined such an extraordinary remedy was inappropriate in light of the State's diligent efforts to obtain the evidence.

B.      ALLEGED *BRADY*[4] VIOLATION

Mr. Groves argues the State violated *Brady* by not disclosing the fact that Ms.

Jagmin ran the DNA from the revolver against the CODIS database, which did not result

in a match.

*Brady* imposes a duty on the State to disclose material evidence favorable to the

defendant. *See Brady*, 373 U.S. at 87. If the State suppresses such evidence, this violates

due process regardless of whether the State acted in good faith or bad faith. *Id.* To

establish a *Brady* violation, a defendant must demonstrate the existence of each of three

necessary elements: (1) The State must have suppressed the evidence, either willfully or

inadvertently, (2) The evidence at issue must be favorable to the accused, either because it

is exculpatory, or because it is impeaching, and (3) Prejudice must have ensued such that

there is a reasonable probability that the result of the proceeding would have differed had

the State disclosed the evidence to trial counsel. *Strickler v. Greene*, 527 U.S. 263, 281-

82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). A defendant's *Brady* claim fails if he or

she fails to demonstrate any one element. *Id.*

The State has a duty to learn of any favorable evidence "known to the others acting

on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S.

---

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). But *Brady* does not obligate the State to communicate preliminary or speculative information. *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990); *State v. Davila*, 184 Wn.2d 55, 71, 357 P.3d 636 (2015).

Here, Mr. Groves argues the State violated *Brady* based on the following remark in Ms. Jagmin's report: "The major profile from the hammer of the revolver (QC) was uploaded to and searched against the state level of the [CODIS] database, and no probative matches resulted." SAG Attach. B, at 2. Mr. Groves argues his DNA profile was in the CODIS database and, therefore, the fact that the DNA on the revolver did not match was favorable evidence.

Mr. Groves fails to show that the State suppressed this evidence. We acknowledge that Ms. Jagmin was acting on the State's behalf, and the State therefore had a duty to learn of the information she had and to promptly disclose it. But there is nothing in the record to suggest that Ms. Jagmin delayed the issuance of her report to the State, or that the State withheld the report once it received the report.

C.    DNA EXPERT'S STATISTICAL CONCLUSIONS

Mr. Groves argues that the trial court improperly admitted Ms. Jagmin's expert testimony that the "probability of selecting an unrelated individual at random from the

28

U.S. population that has a matching profile to the evidence sample, is one in 2.7

sextillion." RP at 1002.

Mr. Groves relies on *Buckner* I, which held that a DNA expert's testimony that the

defendant's DNA pattern would occur in only 1 in 19.25 billion Caucasians, and was thus

"unique," was inadmissible. *State v. Buckner*, 125 Wn.2d 915, 919, 890 P.2d 460 (1995)

(*Buckner* I). Even assuming Mr. Groves preserved this issue for appeal (he did not), and

also assuming Ms. Jagmin's testimony would be inadmissible under *Buckner* I (Ms.

Jagmin never testified the sample was "unique"), our Supreme Court reversed itself two

years later in *State v. Buckner*, 133 Wn.2d 63, 941 P.2d 667 (1997) (*Buckner* II). *Buckner*

II held that "there should be no bar to an expert giving his or her expert opinion that,

based upon an exceedingly small probability of a defendant's DNA profile matching that

of another in a random human population, the profile is unique." *Id.* at 66.

D.    ALLEGED FIFTH AMENDMENT VIOLATIONS

Mr. Groves argues the trial court erred when it admitted his statements to

Detective Clasen.[5]  He argues he only agreed to the interview in order to explain his

---

[5] Mr. Groves also gave a statement to Detective Jennifer Katzer, which Mr. Groves argues was also obtained in violation of the Fifth Amendment. However, the trial court suppressed this statement and the State did not seek to introduce it at trial.

innocence to Detective Clasen, and thus "did not waive his rights with a full awareness of the consequences of his decision." Second Suppl. Br. of Appellant at 20.

A suspect who has been advised of his or her *Miranda* rights against self-incrimination may waive those rights, provided the waiver is made knowingly and intelligently. *Miranda*, 384 U.S. at 444. To be knowing and intelligent, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). But the Fifth Amendment does not require the police to supply the defendant extraneous information about the case to help the defendant calibrate his or her self-interest in deciding whether to speak or remain silent. *Id.* at 422. Rather, "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23.

Here, before beginning the interview, Detective Clasen properly advised Mr. Groves that anything he said could be used as evidence against him. Although Mr. Groves requested the interview in an attempt to exonerate himself, the record does not indicate that Detective Clasen ever misrepresented his intention to collect evidence.

30

Mr. Groves relies on *State v. Humphries*, 181 Wn.2d 708, 336 P.3d 1121 (2014). The issue in that case was whether defense counsel could stipulate to an element of the offense over the defendant's express objection. *Id.* at 714. Mario Humphries expressly objected to the stipulation, but the trial court and his attorney both told him his consent was not required. *Id.* at 717. The stipulation was then read to the jury as part of the State's case-in-chief. *Id.* at 717-18. After the defense rested, Mr. Humphries eventually acquiesced and agreed to sign the stipulation. *Id.* at 718. Our Supreme Court held that Mr. Humphries's late acquiescence—after the damage had been done—was not a knowing, intelligent, and voluntary waiver of his right to require the State to prove every element of the crime. *Id.*

*Humphries* does not apply here. Mr. Humphries was told he could not object to the stipulation, and thus had incorrect information about the nature of his constitutional right. Here, Mr. Groves knew his statements could be used as evidence, but still consented to the interview. Accordingly, the trial court did not err when it admitted Mr. Groves's statement at trial.

E.     VARIOUS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Mr. Groves raises a variety of claims that he received ineffective assistance of counsel. The Sixth Amendment guarantees criminal defendants the right to effective

31

assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052,
80 L. Ed. 2d 674 (1984). A defendant receives ineffective assistance if the attorney's
conduct (1) falls below a minimum objective standard of reasonable attorney conduct, and
(2) prejudiced the defendant, i.e., there is a reasonable probability the attorney's conduct
affected the case's outcome. *State v. Benn*, 120 Wn.2d 631, 663, 845 P.2d 289 (1993).
Because ineffective assistance of counsel is an issue of constitutional magnitude, it may
be considered for the first time on appeal. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d
177 (2009).

"There is a strong presumption that counsel has rendered adequate assistance and
has made all significant decisions in the exercise of reasonable professional judgment."
*Benn*, 120 Wn.2d at 665. Counsel does not perform deficiently when he or she declines
to raise a nonmeritorious argument at trial, given the argument's likelihood of failure.
*See State v. Williams*, 152 Wn. App. 937, 944-45, 219 P.3d 978 (2009), *rev'd on other
grounds*, 171 Wn.2d 474, 251 P.3d 877 (2011). This court reviews ineffective assistance
claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

### 1. *Ineffective for not challenging search warrant*

Mr. Groves argues defense counsel was ineffective for failing to challenge the
search warrant. He argues Detective Weed's affidavit failed to establish the required

32

nexus between the first degree assault and the 2407 N. Ellington Street home. He also

argues that the search of his bedroom exceeded the scope of the search warrant when

Detective Shull opened a locked safe in his room.

When reviewing the issuing judge's decision to issue a search warrant, appellate

review is limited to the four corners of the affidavit. *State v. Neth*, 165 Wn.2d 177, 182,

196 P.3d 658 (2008). This court gives great deference to the issuing judge's assessment

of probable cause and resolves any doubts in favor of the search warrant's validity. *State*

*v. Chenoweth*, 160 Wn.2d 454, 477, 158 P.3d 595 (2007). The issuing judge "is entitled

to make reasonable inferences from the facts and circumstances set out in the affidavit."

*State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). Here, the warrant request

stated probable cause that Mr. Groves had committed one or more crimes with a gun,

stated that Mr. Groves had been located by law enforcement at the 2407 N. Ellington

Street address one month before, and requested authority to search that residence for and

seize a handgun, ammunition, a cellular phone, and evidence that Mr. Groves resided at

the address.

A search warrant may be issued only if the affidavit shows probable cause. *State*

*v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Probable cause exists where the

search warrant affidavit sets forth "facts and circumstances sufficient to establish a

reasonable inference that the defendant is involved in criminal activity and that evidence of the criminal activity can be found at the place to be searched." *Maddox*, 152 Wn.2d at 505. Accordingly, "'probable cause requires a nexus between [the] criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.'" *Thein*, 138 Wn.2d at 140 (quoting *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)). For drug crimes, this nexus between criminal activity and the place to be searched requires more than a showing that the suspect is probably involved in drug dealing and resides at the place to be searched. *Id.* at 141. Rather, the probable cause standard requires specific facts from which to conclude evidence of illegal activity will likely be found at the place to be searched. *Id.* at 147.

A warrant authorizing the search of an apartment may also include the search of a padlocked locker located in a storage room next to the defendant's apartment, even if the locker is not mentioned in the affidavit supporting the search warrant. *State v. Llamas-Villa*, 67 Wn. App. 448, 453, 836 P.2d 239 (1992) (concluding that because the storage locker did not constitute a separate building and was not intentionally excluded from the warrant, the officers did not exceed the scope of the warrant when they searched the locker).

34

Here, Mr. Groves is correct that an obvious connection between the evidence sought and the 2407 N. Ellington address was not present in Detective Weed's affidavit. However, guns, unlike drugs, are likely to be kept in an individual's home and are kept for longer periods of time. Thus, additional information connecting guns to Mr. Groves's room was not necessarily required to establish the required nexus. *See United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (gun was likely to be found in the defendant's home after the bank robbery because the gun was "not unlawful in itself or particularly incriminating" and because "people who own pistols generally keep them at home or on their persons"); *United States v. Rahn*, 511 F.2d 290, 293-94 (10th Cir. 1975) (despite no observation of guns at residence, there was sufficient nexus between firearms and home because "it is pretty normal . . . for individuals to keep weapons in their homes").

Mr. Groves cites *Thein*, which requires a specific factual nexus between alleged illegal drug activity and the defendant's residence. However, he cites no authority that refutes the above federal holdings that pertain to searches for guns. Applying the strong presumption that counsel has rendered adequate assistance, together with the fact that no clear contrary authority exists, we conclude Mr. Groves has failed to demonstrate defense counsel performed deficiently in not challenging the search warrant.

35

2. *Ineffective for not utilizing court-appointed forensic expert and investigator*

Mr. Groves argues defense counsel was ineffective in failing to utilize Kate Sweeney, his court-appointed forensics expert, and Marlene Goodman, his court-appointed investigator. He argues defense counsel should have instructed Ms. Sweeney and Ms. Goodman to acquire buccal swab samples from Mr. Koback, Mr. Hanson, and Mr. Kennedy, in order to determine if any of their DNA was on the revolver.

Mr. Groves fails to show deficient performance. Defense counsel intended to independently test the DNA on the revolver and could have done so if Mr. Groves had agreed to a continuance. Mr. Groves also fails to show prejudice. He asserts that Mr. Koback's, Mr. Hanson's, or Mr. Kennedy's DNA *could* have also been on the revolver, but this is entirely speculative.

3. *Ineffective for filing frivolous motions*

Mr. Groves argues defense counsel rendered ineffective assistance for filing pretrial motions "that had no basis in fact and were unsupported by legal authority." PRP at 15. Specifically, he contends defense counsel was ineffective for filing three motions: (1) the motion to dismiss for insufficient evidence, (2) the motion to exclude late-produced evidence, and (3) the motion in limine and motion to suppress the revolver the police found at Ms. Sampson's house.

36

However, in filing these pretrial motions, defense counsel sought the same relief Mr. Groves now seeks in his SAG and PRP. Mr. Groves cannot argue that defense counsel performed deficiently for doing what Mr. Groves now seeks to do. It is also unclear how moving to exclude or suppress unfavorable evidence prejudiced Mr. Groves.

4. *Ineffective for not bringing* Brady *claim*

As discussed above, Mr. Groves cannot establish that the State suppressed any evidence and the record is insufficient to evaluate the question of prejudice. Both are necessary here.

5. *Ineffective for failing to secure the appearance of other eyewitnesses*

Mr. Groves argues defense counsel was ineffective for not securing "the fourteen eyewitnesses . . . who describe someone other than Mr. Groves as the suspect." Suppl. SAG at 12. Mr. Groves later provides a list of 13 people who he contends "were interviewed on the night of this event, and not one of them [identified] anyone resembling Mr. Groves." Suppl. SAG at 13-14.

The individuals Mr. Groves refers to are other tenants in the apartment building. Two individuals on this list actually testified at trial: Jessica Felke and Melvin Thornton. The likely reason why only these two testified was because they were the only tenants who saw the shooting. The rest of the individuals are mentioned in various police reports,

37

but these reports indicate they only saw minor portions of the incident and did not see the actual shooting. Although Mr. Groves makes a general claim that he could have benefitted from the testimony of these eyewitnesses, he does not point to any specific information any of them could have supplied at trial that would have helped him. Without this, this court is unable to determine whether counsel's performance was deficient or if it prejudiced Mr. Groves.

F.     FAILURE TO ENTER FINDINGS AND CONCLUSIONS AFTER CRR 3.6 HEARING

Mr. Groves contends the trial court's failure to enter findings of fact and conclusions of law relating to his motion to suppress the revolver requires reversal and dismissal.

Under CrR 3.6(b), the trial court is required to enter written findings and conclusions only if the trial court holds an evidentiary hearing on the CrR 3.6 motion. Here, the trial court did not hold an evidentiary hearing. The CrR 3.6 hearing was limited to argument and did not involve the admission or consideration of evidence. Because the trial court did not conduct an evidentiary hearing on Mr. Groves's CrR 3.6 motion, it did not violate CrR 3.6(b) by not entering written findings of fact and conclusions of law. *See State v. Powell*, 181 Wn. App. 716, 722-23, 326 P.3d 859 (2014).

38

G.    APPELLATE COSTS

Because both parties prevailed on major issues, neither party has substantially prevailed. We therefore decline to award appellate costs under RAP 14.2. *McClarty v. Totem Elec.*, 157 Wn.2d 214, 230-31, 137 P.3d 844 (2006).

## CONCLUSION

We affirm Mr. Groves's convictions for first degree assault, drive-by shooting, and first degree unlawful possession of a firearm. We accept the State's concession that the trial court erred when it imposed the firearm enhancement to the drive-by shooting conviction. We reverse Mr. Groves's conviction for felony harassment and remand for judgment of dismissal with prejudice for the felony harassment count and resentencing consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Korsmo, J.

Pennell, J.

39